IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


DOVEY LYNN SMALL,                )
                                 )
            Petitioner,          )          Case No. CV-00-112-S-EJL
                                 )
v.                               )          **MEMORANDUM DECISION**
                                 )          **AND ORDER**
DAN COPELAND,                    )
                                 )
            Respondent.          )
_____ )

        Pending before the Court in this habeas corpus case brought by Petitioner Dovey

Lynn Small ("Petitioner") are various motions filed by the parties which are now ripe for

adjudication, including the Motion for Summary Judgment filed by Respondent Dan

Copeland ("Respondent") seeking dismissal of the claims earlier determined to be

procedurally defaulted and denial of the remainder of the claims on the merits.  Having

fully reviewed the record, including the state court record, the Court finds that the parties

have adequately presented the facts and legal arguments in the briefs and record and that

the decisional process would not be significantly aided by oral argument.  Therefore, in

the interest of avoiding further delay, the Court shall decide this matter on the written

motions, briefs, and record without oral argument.  D. Idaho L. Civ. R. 7.1(d).

Accordingly, the Court enters the following Order.


MEMORANDUM DECISION AND ORDER 1

## PROCEDURAL BACKGROUND

In March 1982, Petitioner Dovey Small was found guilty after trial by jury of murder, robbery, conspiracy to commit murder, and conspiracy to commit robbery. (State's Lodging A-2, pp. 130-138.)  Thereafter, Petitioner was sentenced to two fixed life terms for first-degree murder and robbery and two indeterminate thirty-year sentences for each conspiracy count, all to be served concurrently.  (State's Lodging A-2, pp. 236-38.)

Petitioner filed a direct appeal, which was decided by the Idaho Supreme Court. *State of Idaho v. Small*, 690 P.2d 1336 (Idaho 1984) ("*Small I*").  She next filed a state post-conviction proceeding, which was summarily dismissed by the state district court. The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied the petition for review.  (*Small v. State of Idaho*, 971 P.2d 1151 (Idaho Ct. App. 1998) ("*Small II*"); State's Lodging D-16.)

After those matters were concluded, Petitioner filed this federal habeas corpus action.  When Petitioner was informed by the federal court that some of her claims were unexhausted or procedurally defaulted, she elected to file a successive state post-conviction petition, which was eventually dismissed by the state district court as untimely.  (State's Lodging E-1.)  This case was stayed during the successive state court proceedings.  The Idaho Court of Appeals subsequently affirmed dismissal, and the Idaho Supreme Court denied the petition for review.  (State's Lodgings F-8 & F-10.)  On May

MEMORANDUM DECISION AND ORDER 2

8, 2007, the Court reopened this case, and thereafter Petitioner filed an Amended Petition for Writ of Habeas Corpus.  (Docket No. 30.)

Respondent earlier filed a Motion to Dismiss in this case.  The Court determined that the following claims were procedurally defaulted and could not be heard absent a showing of cause and prejudice or actual innocence: Claims One(2)(b), (3), (4), (5), (6), and (7); Claim Two; Claim Three; Claim Four (except construed as a *Miranda* claim); and Claim Five.  The Court ordered Respondent to file a motion for summary judgment addressing the merits of the following remaining claims: Claims One(1), One(2)(a), and Four (construed as a *Miranda* claim).

## PRELIMINARY MOTIONS

Pending before the Court are the parties' Motions for Extension of Time regarding the filing of their dispositive motions and responses.  (Docket Nos. 55, 58, 59, 60 & 65.) Good cause appearing from the supporting Affidavits, the Motions for Extension of Time shall be granted, and the motions and responses have been deemed timely filed and have been considered by the Court.

Petitioner has filed a "Motion to Reserve the Right to Address Claims One, One (2)(a), and Four."  (Docket No. 56.)  Petitioner states that she intends to address these claims in response to the Motion for Summary Judgment.  Good cause appearing, the Motion shall be granted.

Petitioner has filed a Motion for Appointment of Counsel.  (Docket No. 51.) There is no constitutional right to counsel in a habeas corpus action.  *Coleman v.*

MEMORANDUM DECISION AND ORDER 3

*Thompson,* 501 U.S. 722, 755 (1991).  A habeas petitioner has a right to counsel, as provided by rule, if counsel is necessary for effective discovery or an evidentiary hearing is required in his case.  *See* Rules 6(a) & 8(c) of the Rules Governing Section 2254 Cases. In addition, the Court may exercise its discretion to appoint counsel for an indigent petitioner in any case where required by the interests of justice.  28 U.S.C. § 2254(h); 18 U.S.C. § 3006A(a)(2)(B).  Whether counsel should be appointed turns on a petitioner's ability to articulate his claims in light of the complexity of the legal issues and his likelihood of success on the merits.  *See Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983).

Here, Petitioner has been able to adequately articulate her claims.  While the merits of some of the claims pose somewhat complex questions, Petitioner was aided by counsel in formulating arguments in the state court proceedings and is not permitted to present new claims on habeas corpus review.  After reviewing the extensive state court record in this case in light of the procedural default issues and the claims presented in the habeas corpus petition, the Court concludes that appointment of counsel would not significantly aid Petitioner in making her arguments or help the Court in its decisionmaking.  As a result, Petitioner's Motion for Appointment of Counsel shall be denied.

MEMORANDUM DECISION AND ORDER 4

**PETITIONER'S RESPONSE RE: PROCEDURAL DEFAULT**

**A.      Standard of Law**

Habeas corpus law requires that a petitioner "exhaust" his or her state court remedies before pursuing a claim in a federal habeas petition.  28 U.S.C. § 2254(b).  To exhaust a claim, a habeas petitioner must fairly present it to the highest state court for review in the manner prescribed by state law.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Unless a petitioner has exhausted his state court remedies relative to a particular claim, a federal district court cannot grant relief on that claim, although it does have the discretion to deny the claim.  28 U.S.C. § 2254(b)(2).

State remedies are considered technically exhausted, but not *properly* exhausted, if a petitioner failed to pursue a federal claim in state court and there are no remedies now available.  *O'Sullivan*, 526 U.S. at 848.  A claim may also be considered exhausted, though not properly exhausted, if a petitioner pursued a federal claim in state court, but the state court rejected the claim on an independent and adequate state law procedural ground.  *Coleman v. Thompson*, 501 U.S. 722, 731-732 (1991).  Under these circumstances, the claim is considered "procedurally defaulted."  *Coleman,* 501 U.S. at 731.  A procedurally defaulted claim will not be heard in federal court unless the petitioner shows either that there was legitimate cause for the default and that prejudice resulted from the default, or, alternatively, that the petitioner is actually innocent and a miscarriage of justice would occur if the federal claim is not heard.  *Id.*

MEMORANDUM DECISION AND ORDER 5

The following standard of law applies to cause and prejudice and actual innocence. If a petitioner's claim is procedurally defaulted, the federal district court cannot hear the merits of the claim unless a petitioner meets one of two exceptions: a showing of adequate legal cause for the default and prejudice arising from the default; or a showing of actual innocence, which means that a miscarriage of justice will occur if the claim is not heard in federal court. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

To show "cause" for a procedural default, a petitioner must ordinarily demonstrate that some objective factor external to the defense impeded his or his counsel's efforts to comply with the state procedural rule at issue. *Murray v. Carrier*, 477 U.S. at 488.  For example, an attorney's errors that rise to the level of a violation of the Sixth Amendment's right to effective assistance of counsel may, under certain circumstances, serve as a cause to excuse the procedural default of other claims, *id.*; however, an allegation of ineffective assistance of counsel will serve as cause to excuse the default of other claims *only* if the ineffective assistance claim is, itself, not procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 454 (2000).  In other words, before a federal court can consider ineffective assistance as cause to excuse the default of underlying habeas claims, a petitioner generally must have presented the ineffective assistance claim in a procedurally proper manner to the state courts, such as in a post-conviction relief petition. In addition, because convicted persons do not have a federal constitutional right to the effective assistance of counsel during state post-conviction proceedings, *Bonin v.*

MEMORANDUM DECISION AND ORDER 6

*Vasquez*, 999 F.2d, 425, 430 (1993), any shortcomings of counsel during the post-

conviction action cannot serve as a basis for cause to excuse Petitioner's procedural

default.  *See Coleman*, 501 U.S. at 752 ("a petitioner cannot claim constitutionally

ineffective assistance of counsel in [post-conviction] proceedings").

To demonstrate "prejudice," a petitioner bears "the burden of showing not merely

that the errors [in his proceeding] constituted a possibility of prejudice, but that they

worked to his actual and substantial disadvantage, infecting [the] entire [proceeding] with

errors of constitutional dimension."  *United States v. Frady*, 456 U.S. 152, 170 (1982).

If a petitioner cannot show cause and prejudice for his procedural default, he can

still bring the claim in a federal habeas petition if he demonstrates that failure to consider

the claim will result in a "fundamental miscarriage of justice," which means that a

constitutional violation has probably resulted in the conviction of someone who is

actually innocent.  *Murray v. Carrier*, 477 U.S. at 496.  To satisfy this standard, a

petitioner must make a colorable showing of factual innocence.  *Herrera v. Collins*, 506

U.S. 390, 404 (1993).  Types of evidence "which may establish factual innocence include

credible declarations of guilt by another, *see Sawyer v. Whitley*, 505 U.S. 333, 340

(1992), trustworthy eyewitness accounts, *see Schlup v. Delo*, 513 U.S. 298, 331 (1995),

and exculpatory scientific evidence."  *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996).

MEMORANDUM DECISION AND ORDER 7

**B.    Discussion**

Petitioner's claims were defaulted as a result of failure to bring them to the Idaho appellate courts' attention in a proper manner (or at all), either in briefing on direct appeal or post-conviction appeal, or in a petition for review before the Idaho Supreme Court. Petitioner has never properly exhausted a claim of ineffective assistance of counsel for failure to raise the defaulted claims, and thus she cannot use ineffective assistance as cause to excuse the default of other claims because the ineffective assistance claim is, itself, procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 454 (2000). Further, Petitioner cannot assert ineffective assistance of counsel in a post-conviction case as cause because there is no constitutional right to such counsel. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

Petitioner also argues that she filed her federal Petition pro se, and it should be liberally construed. The Court has, in fact, liberally construed Petitioner's Petition. For example, the Court is permitting Petitioner to proceed on Claim Four as a *Miranda* claim, even though the other allegations asserted in Claim Four render it procedurally defaulted. The Court has also reviewed the state court record in a liberal manner, and has reviewed the record to determine if any ground exists for the excuse of the procedural default that is evident in the record, though not mentioned by Petitioner. However, the Court has found nothing that would excuse the default of the claims set forth in the Court's previous Order.

MEMORANDUM DECISION AND ORDER 8

Petitioner alleges that the miscarriage of justice exception should apply in her case. However, she then points to her *Miranda* argument as grounds for application of this exception. A *Miranda* argument is an argument centered on legal insufficiency, not factual innocence, and, as such, cannot be the basis of a miscarriage of justice claim. The Court has also considered and rejects the notion that co-defendant McKinney's most recent affidavit shows that Petitioner is actually innocent, which the Court more fully discusses herein below.

The Court concludes that the record does not reflect any basis for excusing the procedural default of Petitioner's Claims One(2)(b), (3), (4), (5), (6), and (7); Claim Two; Claim Three; Claim Four (except construed as a *Miranda* claim); and Claim Five. As a result, these claims shall be dismissed with prejudice.

## RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

### A.      Standard of Law Governing Habeas Corpus Claims

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Federal Rules of Civil Procedure apply to habeas corpus actions except where application of the rules would be inconsistent with established habeas practice and procedure. Rule 11, Rules Governing Section 2254 Cases. Accordingly, summary judgment motions are appropriate in habeas corpus proceedings where there are no genuine issues of material fact and the moving

MEMORANDUM DECISION AND ORDER 9

party is entitled to judgment as a matter of law. *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977).

Petitioner's case was filed after April 24, 1996, making it subject to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). In order to obtain federal habeas corpus relief from a state court judgment under AEDPA, the petitioner must show that the state court's adjudication of the merits of his federal claim either:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

To prevail under § 2254(d)(1), a petitioner must show that the state court was "wrong as a matter of law," in that it "applie[d] a legal rule that contradicts our prior holdings" or that it "reache[d] a different result from one of our cases despite confronting indistinguishable facts." *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (citing *Williams v. Taylor*, 529 U.S. 362 (2000)). Or, a petitioner can prevail by showing that the state court was "[objectively] unreasonable in applying the governing legal principle to the facts of the case," or "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Id.*, 530 U.S. at 166. However, a petitioner cannot prevail under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court

MEMORANDUM DECISION AND ORDER 10

decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Though the source of clearly established federal law must come from the holdings of the United States Supreme Court, circuit law may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

Under AEDPA, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(e)(1). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; 28 U.S.C. § 2254(d)(2).

## B. Evidence Presented at Trial, Jury Verdict, and Sentencing

In April 1981, Randy McKinney, age 19, and Petitioner Dovey Small, age 27, were transients who had a gun, but no vehicle or money. They hitchhiked from Bullhead City, Arizona through several states, asking for rides, housing, and food from strangers. Their goal was to reach one of the northwestern states to find work. They decided to stop in Blackfoot, Idaho, to visit Dovey Small's sisters, Cathy Mangum and Ada Mangum. While there, Cathy Mangum asked her friend, Robert Bishop, Jr., to give them a ride to a neighboring town. Bishop agreed. On April 8, 1981, just before McKinney and Petitioner were scheduled to leave town with Bishop, McKinney killed Bishop by shooting him once

in the stomach and four times in the head, in the desert outside of Arco, Idaho, causing Bishop's death.

McKinney was arrested on the day of the shooting.  Petitioner gave several statements to police and was arrested on an unrelated felony forgery warrant on the day of the shooting.  She was unable to post bond, and was later held in jail indefinitely as a material witness in McKinney's case until she gave a deposition.  After the deposition, where she had counsel Barton Davis to assist her, she was released.

On or about August 5, 1981, Petitioner was charged in the state district court in Butte County, Idaho, with the first degree murder of Robert Bishop, conspiracy to commit murder, robbery, and conspiracy to commit robbery.  (State's Lodging A-1, pp. 1-3.)  She was arrested on that charge, but because she was pregnant, on September 17, 1981, Judge Arnold Beebe released Petitioner on her own recognizance to live with a family while she awaited the birth of her unborn child.  (State's Lodging A-1, pp. 57-58.)   Petitioner's baby was born on November, 13, 1981.  (*Id.*, p. 79.)  McKinney's case was severed from Petitioner's case.  In November 1981, McKinney's case proceeded to trial in neighboring Bonneville County, where he was found guilty by jury of all charges.  On a motion for change of venue, Petitioner was eventually tried in Madison County from February 23, 1982, through March 4, 1982.  (State's Lodging A-4, p. 1; State's Lodging A-2, p. 103.)

Attorney Marlene N. Fleming was initially appointed to represent Petitioner, and it appears that Attorney Christina Burdick, who worked at the same firm as Fleming, also appeared of record to assist Fleming, though no formal appointment of Burdick was made.

MEMORANDUM DECISION AND ORDER 12

(State's Lodging A-1, pp.5-6; 66; 76.)  When Fleming was permitted to withdraw from the case because she was relocating to Pennsylvania, Attorney Ronald Swafford was appointed in her stead.  (*Id*., p. 92.)  Swafford was unable to accept the appointment, and Attorney David Parmenter was appointed instead.  (*Id*., p. 93.)  Parmenter was the only attorney present at Petitioner's trial.  Burdick was actually called to testify at trial about a conversation she had with several witnesses while investigating the case when she and Marlene Fleming were representing Petitioner.  Burdick testified at trial that their representation of Petitioner ended August 17, 1981.  (State's Lodging A-7, p. 907-08.)  Burdick acted as co-counsel at sentencing and on appeal.  (State's Lodging A-3, pp. 49-59.)

Parmenter did not file a pretrial motion seeking suppression of Petitioner's statements to Detective Richardson.  At the beginning of the trial, Parmenter made an oral motion in limine to exclude a witness from testifying about crimes of forgery Petitioner had committed prior to the murder of Robert Bishop.  (*Id*., pp. 28-37.)  The Court granted the motion.

At trial, Coroner C.W. Marvel testified that he picked up the body from its last resting place and observed bullet wounds to the arm, chest, and head.  On cross-examination, Parmenter elicited the information that Marvel had seen two Pepsi bottles balanced on fence posts nearby (supporting the theory that McKinney and Bishop were going to do target shooting).  (State's Lodging A-4, p. 59.)

MEMORANDUM DECISION AND ORDER 13

Mrs. Birdie Peabody, who worked as office manager of the Southgate Motel in Malad, Idaho, testified that McKinney and Petitioner came to stay at the motel on April 6, 1981.  McKinney and Petitioner asked Peabody if she knew anyone who was hiring, and Peabody was able to find McKinney work with Rol Davis.  Davis paid for McKinney and Petitioner's next night's stay in the motel, April 7, 1981.  Peabody heard them say that Davis had paid for the motel because McKinney and Petitioner "were broke."  Peabody overheard Petitioner say to someone, presumably her sister, on the phone, "He better not or I'll kill him."  (State's Lodging A-4, pp. 75-91.)  Peabody observed that Petitioner did most of the talking between Petitioner and McKinney.  Peabody testified that McKinney never actually worked for Davis, and Davis later asked Peabody if she could refund the money he had paid for their motel stay.  (*Id.*, pp. 91-92.)

Cathy Mangum, Petitioner's sister, testified that when she, Ada Mangum, and their friend Robert Anderson picked up Petitioner and McKinney from the motel, McKinney showed Anderson a gun and said, "Hey, I'm going big time.  No more penny ante," and that he repeated that statement several times.  (State's Lodging A-4., pp. 112-118.)  Cathy testified that McKinney also said derogatory things to Anderson about African-Americans, even though Anderson was African-American.  (*Id.*, pp. 115-17.)

Cathy Mangum also testified that the next morning, she and McKinney were sitting on the couch waiting for Robert Bishop (the victim) to come and give McKinney and Petitioner a ride.  Cathy mentioned Bishop, and Randy said, "I'm going to blow him away."  (State's Lodging A-4, pp. 128-131.)  Cathy said, "Who?  You know, he's my

MEMORANDUM DECISION AND ORDER 14

friend."  Cathy testified that McKinney didn't clarify whether he intended to kill Bishop or someone else.  (*Id*., p. 132.)

Cathy also testified that, later, when they were all driving in Bishop's car, a newer Ford Mustang, McKinney made his hand into a gun symbol and pointed it at Bishop and nudged Petitioner.  (*Id*., pp. 140-41.)  Cathy was then dropped off at her home.

Cathy Mangum next saw McKinney and Petitioner later that day about 6:30 p.m. when they drove up in Bishop's car.  Petitioner was crying, confused, and very upset, and said that "she didn't know which way to go, up or down?"  (State's Lodging A-4, p. 159.) Petitioner told Cathy that McKinney had killed Bishop, and McKinney then said to Cathy, "Well, I told you so."  Cathy testified that she asked them if she could have Bishop's jacket for sentimental reasons, and also asked for his gun.  Cathy asked for Bishop's wallet, and both Petitioner and McKinney responded that she couldn't have it.  (*Id.*, p. 155)

Cathy then told Petitioner to get out of the car, and Petitioner told her that she loved McKinney.  Cathy told her husband, Richard Mangum, that Petitioner wanted him to keep Bishop's jacket as a birthday gift, but her husband refused. (State's Lodging A-4, pp. 142-149.)  Cathy also testified that in answer to why he killed Bishop, McKinney said, "For the love of my woman."  (*Id*., p. 157.)  Cathy told them to get away from her house and never return.  (*Id*., p. 151.)

Ada Mangum, another sister of Petitioner, also testified at trial.  (State's Lodging A-4 , p. 171.)  When Ada arrived at the motel to pick up McKinney and Petitioner, Petitioner showed Ada the gun.  (*Id*., p. 186.)  Later in the day, Ada, Bishop, McKinney, and

MEMORANDUM DECISION AND ORDER 15

Petitioner went to the home of a couple who lived together, Casey Wheeless and Denise Garner (also known as Denise Wheeless).  Still later, they went to the trailer home of Casey's mom, Jackie Wheeless, with Bishop and McKinney driving in Bishop's car, and Petitioner, Ada, and Casey (Jackie's son) in Casey's car.  (*Id.*, pp. 216-17.)  Ada testified that on the way there, Petitioner took out the gun and fired it out the window into an old house.  (*Id.*, p. 218.)

Ada Mangum testified that the group later went to the Antler Club, a bar.  McKinney and Petitioner spoke outside the Antler Club for a few moments, and then McKinney and Bishop left in Bishop's car and the women went inside to play pool.  Shortly thereafter, McKinney returned alone in Bishop's car and picked up Ada and Petitioner.  Ada asked McKinney where Bishop was, and McKinney said that he had shot him.  (*Id.*, pp. 225-233.)  Ada testified that she and Petitioner didn't believe him, and so McKinney took them to the place where Bishop's body was.  (*Id.*, pp. 233-238.)  McKinney and Petitioner next dropped Ada off at her home, and both of them asked her not to tell.  Ada could not remember that Petitioner was crying or showing emotion at that time.  (*Id.*, pp. 243-44.)  She also testified that Petitioner said, "You didn't have to shoot him" to McKinney, and McKinney responded that "I did it for the love of my woman."  (*Id.*, pp. 278 & 245.)  McKinney also said it was harder to kill a white man than a black man.  (*Id.*, p. 246.)  Ada also recalled that McKinney had reloaded his gun and passed it to Petitioner on their drive to Ada's home.  (*Id.*, p. 247.)

MEMORANDUM DECISION AND ORDER 16

When Ada was dropped off at home, Ada told her husband, Ronald Mangum (Richard Mangum's cousin), and his friends what happened, and after consulting with them and a lawyer, Ada called the police.  (State's Lodging A-5, pp. 312-14.)  McKinney and Petitioner left town in Bishop's car, but later returned and were found by police at the bowling alley.

Officer Dan Fawcett testified that he responded to a call that the suspects had gone to the bowling alley.  As he approached the Mustang in the bowling alley parking lot, Petitioner was driving, looked at him, and then said, "Let's get the hell out of here." (State's Lodging A-6, p. 336.)  Petitioner then drove to her sister's trailer, got out of the car, and hurriedly walked inside.  (*Id*., p. 337.)  Officers went into the home, where Ada was crying.  She told Officer Frew, "I seen Bob Bishop.  He's dead and Randy killed him." (*Id*., p. 340.)

Ada Mangum testified that she and Cathy Mangum asked Petitioner to stay and turn herself in.  (State's Lodging A-5, pp. 273.)  Petitioner said she was scared and didn't want to turn herself in.  (*Id*.)

Officer Fawcett testified that Officer Frew took Randy into protective custody while the investigation proceeded.  Officer Fawcett then asked Petitioner what she had seen.  She said, "I seen Bob Bishop.  He's dead.  And Randy shot him."  Then she said, "Maybe he's not dead yet.  I know where he's at.  I'll take somebody there and show them where he's at."  (State's Exhibit A-6 at 346.)   Then Officer Fawcett informed Officer Richardson of the conversation, and Petitioner got into Richardson's car.  (*Id*. pp. 355-56.)

MEMORANDUM DECISION AND ORDER 17

Detective Jim Richardson testified that when he arrived at the scene, other officers informed Detective Richardson that McKinney was in the back of a patrol car and that "people inside the trailer house stated he had shot a man." (State's Lodging A-5, pp. 364-67.) Richardson further testified:

> A.  [Dovey] came out of that house quite rapidly. She said, "All right. I'll take you to the body right now." So I said, "Okay, Dovey. You can have a seat in the car." I took her over to my – it was an unmarked brown Chevv patrol unit. Seated her in the front seat of my police unit. I then assigned [Officer] Calvin Frew to take charge of the white Ford Mustang. I told them to seal the vehicle, lock it, call a wrecker, have it impounded. And Officer Calvin Frew took Randy McKinney to the Blackfoot Police Department. And I then went with Dovey Small to try and locate the body.
>
> Q.  And what kind of directions did you get as to where you should go?
>
> A.  Okay. Dovey got in the car. She started talking quite rapidly about this shooting. So I tried to verbally read her rights real quick to her, let her know she had rights because things she was saying could incriminate her and could be used in court against her. She acknowledged to me she understood her rights and she just wanted to hurry and get to the scene because she said, she said the poor man might still be alive.

(State's Lodging A-5, pp. 367-68.)

Detective Richardson then placed a tape recorder between himself and Petitioner and began recording their conversation. (*Id.*, p. 368.) Richardson testified that he believed Petitioner knew their conversations were being recorded. (*Id.*) Petitioner testified at trial that Richardson told her he was recording the conversation, but that she did not see the tape. (State's Lodging A-7, pp. 1166-67.) He taped approximately 20 to 25 minutes of

MEMORANDUM DECISION AND ORDER 18

their conversation, and then the tape ran out. (State's Lodging A-5, pp. 382-83.)  The

recording was not admitted at trial, but portions of it were used by the prosecutor to

impeach Petitioner on cross-examination.  (See State's Lodging A-2, pp. 248-53 & A-4,

Index of Exhibits; State's Lodging A-7, pp. 1166-67.)

     Richardson testified that again about "half-way through" their conversation,

because "she was saying all these incriminating things," he said, "Now, Dovey, you

understand your rights?"  (State's Lodging A-5, p. 372.)  Richardson testified that he did

not "ask her a lot of questions" because it was "mainly her talking."  (*Id*., p. 372.)  Richard

testified that Petitioner appeared "a little drunk."  (*Id*., p. 388.)  However, he explained:

"There's drunk and being under the influence and being able to understand what's going

on.  To be beyond the legal limit and driving, I would say, yes, she was intoxicated.  But to

be beyond incoherence [sic] or understanding, no, she was okay."  (*Id*.)  During the

conversation, Petitioner said that McKinney told her that he had shot Bishop once in the

stomach and five times in the head.  (*Id*. at 371.)

     After Detective Anderson viewed the body with Petitioner, he picked up Ada

Mangum and took Petitioner and Ada to the Sheriff's Office.  He read them their rights and

presented them with waiver forms.  Petitioner started crying.  Her sister signed the form,

but Petitioner did not.  (State's Lodging A-5, at 374.)

     Denise Garner (Wheeless) testified that when Bishop, McKinney, and Petitioner

came to her house, Petitioner and McKinney sat at her kitchen table and Petitioner was

talking about "a car and some money and some credit cards," and "they were both talking

MEMORANDUM DECISION AND ORDER 19

about taking Bob [Bishop] out on the desert and killing him."  (State's Lodging A-5, p. 400.)  She testified that Petitioner was doing most of the talking, and McKinney was responding and agreeing to what she said.  (*Id*., p. 400-01.)  Petitioner told Denise if she kept her mouth shut, Petitioner would give her some of the money.  (*Id*., p. 401.)

On cross-examination, Mr. Parmenter used a prior statement of Denise Garner to show that she had previously told Detective Anderson that she "heard nothing about credit cards or a pistol."  (State's Lodging A-5, p. 427.)  Mr. Parmenter also asked Denise if she had told Bishop or Casey Wheeless that McKinney and Petitioner planned to kill Bishop before they left her house that day.  She said no.  She also stated she did not report the conversation to the police at that time, but waited five months before she told anyone.  (*Id*., p. 428.)  On redirect, the prosecutor brought out that Denise Garner had told Tana Hampton about the conversation of Petitioner and McKinney in the kitchen.  (*Id*., p. 435.)  Denise said she didn't say anything to the police because she thought her children might be taken away by Health and Welfare, her family was "hassling" her about who she spent her time with, and she was afraid if she said something about Ada's sister, Ada wouldn't talk with her any more.  (*Id*., p. 436.)

Tana Hampton testified that she heard Petitioner say, "If Bob [Wheeless, Casey's father] gave me any sh–t I would blow his sh–t away."  (State's Lodging A-5, p. 447.)  Tana testified that later when she called Denise, Denise told her that "Dovey and Randy had told [Denise] and Casey that they were going to take Bob out and shoot him and take his money and car.  And then leave the state."  (*Id*., p. 452.)

MEMORANDUM DECISION AND ORDER 20

Roger Aston testified that he was a gas station attendant on April 8, 1981, and McKinney used Bishop's credit card to put gas into the white Mustang and then signed Bishop's name on the charge slip.  (State's Lodging A-5, pp. 460-473.)

Richard Mangum testified that he saw McKinney and Petitioner drive up to their home in Bishop's car.  Cathy went out to talk to Petitioner and received the jacket.  Cathy offered Bishop's jacket to Richard from Petitioner and told him Randy shot Bishop, but Richard refused to take the jacket.  (*Id*., pp. 473-487.)

Casey Wheeless, who was a 17-year-old convicted felon at the time of the shooting, testified that Petitioner said she and McKinney had a "piece," that Petitioner showed him the gun, and that she later shot it out the window at a house while they were driving together.  (State's Lodging A-5, pp. 489-498.)  After Petitioner went to Casey's mother's house to dispute whether Casey's mother owed her money on an old car sale transaction, and Petitioner did not get any money from Casey's mother, Casey testified:

> Dovey was upset because she didn't get no money from my mother. And she said she had to get some money and she was talking about Bob Bishop being rich and that he had a bunch of credit cards and a nice car. Then all of a sudden just out of the open she come out and said that her and Randy were going to kill him.  Just, just come out in the open like that.

(State's Lodging A-5, at 504:1-9.)

Casey testified that McKinney and Petitioner discussed killing Bob Bishop in the kitchen of their home and that Petitioner said, "Well, Casey owes me one.  He will do it." Casey had replied, "No way.  I ain't going to even get mixed up in anything like that." (State's Lodging A-5, p. 510.)  Casey testified that when he was in trouble with the law

MEMORANDUM DECISION AND ORDER 21

about a year and half before that time, Petitioner had hidden him a couple of times.  (*Id.*, p. 510.)

Casey testified that Randy then asked him if he knew a good place to dump the body.  (State's Lodging A-5, p. 511.)  Casey said no.  Casey testified that Randy then said he "was going to go out on the desert and shoot Bob Bishop and throw some bushes over and burn them so they wouldn't trace him to them."  (*Id.*, p. 511.)  Casey testified that Petitioner said "that sounds like a good idea."  (*Id.* p. 512.)  After that, Petitioner said, "Well, let's get it done."  And Petitioner said, "Well, let's go."  (*Id.*)  Casey testified that he didn't think they were serious when they left.  (*Id.*, pp. 513 & 551.)

On cross-examination, Parmenter confronted Casey Wheeless with a prior statement where he said that Petitioner was known to kid, joke, and "bullsh–."  (State's Lodging A-5, pp. 550-551.) Casey also admitted that, regarding the talk about killing Bishop, Petitioner could have been joking and McKinney could have been serious.  (*Id.*, pp. 552-53.) Parmenter also asked Casey if he ever told Dave Gunderson that Casey "wanted a conviction" in Petitioner's case.  (*Id.*, p. 556.)  Parmenter also asked Casey if he ever told anyone that he was paid money by Bob Bishop, Sr., for his testimony.  (*Id.*, pp. 557-58.)

Casey Wheeless further testified that, prior to the trial, Petitioner was speaking on the telephone to Denise about giving Denise some maternity clothes, and Petitioner asked to speak to Casey and "said that she can't remember saying anything in the kitchen but if she did, to have me say that Randy said everything and she didn't say nothing." (State's Lodging A-5, pp. 566 & 569-70.)  She asked that Casey "call Mr. Parmenter and change

MEMORANDUM DECISION AND ORDER 22

[his] story." (*Id.*)  Casey clarified that when McKinney said he was going to kill Bishop in the kitchen conversation, Petitioner agreed with him.  (*Id.*, pp. 574-75.)  Parmenter then asked Casey why he had not told Parmenter about Petitioner asking him to change his testimony when Parmenter and Casey had spoken about that conversation, even in the face of Parmenter asking, "Did she [Petitioner] say anything else?"  (*Id.* at 579-80.)

Lois Larsen Martinez, Denise's cousin, testified that she had been at Denise's home when McKinney, Bishop, and Petitioner were there.  Lois also testified that later Casey told her that McKinney had solicited him to kill Bishop, and Denise told her that she and Casey thought Petitioner and McKinney were kidding.  (*Id.* at 586-97).  Parmenter objected to the testimony on hearsay grounds, and the Court stated it would be giving a limiting instruction. (*Id.*, p. 591.)

Officer Ron Hinds testified that at the police station, Ada Mangum was crying and very upset, and Petitioner had a regular demeanor.  (State's Lodging A-6, p. 660.)  He also testified about the crime scene and the items found in Bishop's car.  (*Id.*,  pp. 644-727.)  Hinds testified that he first heard about the kitchen conversation from Tana Hampton, and then he spoke to Denise Garner, who broke down and cried when she told him about the kitchen conversation.  (*Id.*, pp. 700-03.)  Hinds testified that when he asked Petitioner for a statement at the Sheriff's Office, she said she was nervous and wanted to go to the hospital to get a tranquilizer.  (*Id.*, p. 726.)

Roy Helderman, who owned the Antler Club, testified that after McKinney and Bishop dropped Ada Mangum and Petitioner off at the Antler Club, McKinney returned to

MEMORANDUM DECISION AND ORDER 23

pick up the women about 15 minutes later, and that he entered and said, "Let's go," and they all left.  (State's Lodging A-6, pp. 741-748.)  He noted that Ada and Petitioner did not have any trouble shooting pool, nor were they falling down while at the bar.  (*Id*., p. 745.)

Randy McKinney was called by the prosecution and took the stand.  He took the Fifth Amendment on anything that happened on April 8, 1981.  (State's Lodging A-6, pp. 749-50.)  Parmenter said he would wait his turn to call McKinney and see if he would answer any questions at that time.  (*Id*., p. 753.)  When Parmenter called McKinney later during the defense's case in chief, McKinney again took the Fifth and refused to answer.  (State's Lodging A-8, pp. 1229-30.)

Dave Gunderson testified that he had a jail cell in the Blackfoot County Jail that was several cells away from Petitioner, and that Petitioner told him that she was withholding information from law enforcement officers that the Bishop murder had been planned.  Dave Gunderson contacted Bishop's father, Robert Bishop, Sr., and officers became aware of the allegation at that time.  (State's Lodging A-6, pp. 798-826.)  Parmenter questioned Gunderson's motives on cross-examination.

Robert Bishop, Sr., testified about the Gunderson statement and stated that he did not offer or provide Gunderson money or a reward for his testimony.  Robert Bishop, Sr., denied ever having said that he wanted a conviction in his son's murder case.  (State's Lodging A-6, pp. 826-40.)

Dr. Charles Garrison testified that he performed an autopsy on Bishop's body.  He found seven total bullet holes in Bishop's body (some being from the same bullet track),

MEMORANDUM DECISION AND ORDER 24

with four being in the head, and five bullets inside Bishop's body (with none having

exited). He opined that Bishop was still alive after being shot in the chest and could have

survived the wound had he received proper medical attention, and that the four shots to the

head had come between a few moments and five to ten minutes later, killing him virtually

instantaneously. (State's Lodging A-6, pp. 840-877.) Although Dr. Garrison speculated

that the shots to the head could have come as much as two hours later, he clarified that it

was his opinion that it is likely they came between five and ten minutes after the shot to the

chest. (*Id.*, p. 864.)

     At the end of the State's case in chief, Parmenter moved for a directed verdict. The

Court reserved ruling on Count I, paragraph A (that Petitioner shot Bishop), and denied the

motion as to the other counts. (State's Lodging A-6, pp. 891-900.)

     In the defense case in chief, Parmenter called Norman Turner, who said that his jail

cell was located between Petitioner and Dave Gunderson, and he heard the entire

conversation between Petitioner and Dave Gunderson. Petitioner and Gunderson had

spoken only of Petitioner getting ready to undergo hypnosis and Petitioner's fear of losing

her child. (State's Lodging A-7, p. 925.) The prosecutor brought out on cross-examination

that Turner was released before Petitioner and Gunderson were released, and thus they

could have spoken after the date of Turner's release. (*Id.*, p. 935.) Turner also testified that

Petitioner said her boyfriend "was going to blow him [Bishop] away." (*Id.*, p. 841.)

     Parmenter called William Parsons to testify that Casey Wheeless generally had a bad

reputation for truth, veracity, and integrity in the community. (State's Lodging A-7, pp.

MEMORANDUM DECISION AND ORDER 25

958-59.)  Parmenter also called Richard Larsen and Tana Hampton to testify that Casey

Wheeless had a bad reputation in the community.  (State's Lodging A-8, pp. 1222-1223 &

1227-28.)

Parmenter made an offer of proof, intending to call Psychologist Gary Payne, who

had previously examined McKinney to testify that McKinney was the type of person to

carry out impulsive criminal acts.  (*Id.*, pp. 960-66.)  The Court refused to permit the

testimony.

Petitioner testified extensively in her own defense.  Contrary to Casey Wheeless's

testimony, Petitioner testified that she never "hid Casey out"; rather, Ada hid him.

However, she admitted that she lived in the same house as Ada at that time.  (State's

Lodging A-7, at 971.)  To explain and counter Birdie Peabody's testimony, Petitioner

testified that Petitioner had said to Ada on the telephone that if Ada's husband, Ron, ever

beat Ada's daughter Memi, then Petitioner would '"kill him,' meaning jump in his face and

argue with him."  (*Id.*, pp. 974-75.)  Petitioner also stated that Mrs. Peabody was lying

when she testified that the farmer came into the motel to pay for one night's lodging for

Petitioner and McKinney; Petitioner said the farmer gave them the money and did not come

near the motel.  (*Id.*, p. 1064.)

Contrary to Cathy's testimony, Petitioner testified that she did not recall McKinney

saying "I'm going big time now, no more penny ante."  (State's Lodging A-7, p. 977.)

Petitioner testified that prior to going to the Antler Club, they stopped and played pool at

Sam's Place, and after Bishop and McKinney came out of the bathroom, McKinney said

MEMORANDUM DECISION AND ORDER 26

that Bishop had been acting "queer," and that if he did it again, Randy would "kill him." (*Id.*, pp. 986-7.)  Countering Casey's testimony, Petitioner testified, "I didn't say, 'We got a piece.'  I said, 'Randy has a gun.'" (*Id.*, p. 997.)  To counter Tana Hampton's testimony, Petitioner testified that she "did not say 'if Bob Wheeless gives me any crap, I'll blow his crap away'"; rather, she said, "I was going to jerk a knot in his mother's neck if she didn't give me any money after what she did to the car."  (*Id.*, p. 997.)

Parmenter then asked Petitioner about the alleged kitchen conversation regarding the Bishop murder:

> Q.    Okay.  Do you remember any discussion at all in the kitchen of killing Bob Bishop?
>
> A.    Mr. Parmenter, there was no discussion about killing nobody in that kitchen.  The only thing that was said in that kitchen–because Randy didn't know anybody and I introduced him to Casey, and he was talking about someplace in California.  I don't know.  'Cause I didn't pay that much attention.  I was high, and I was trying to sip down the coffee to sober me up.  I didn't pay that much attention to what him and Casey were talking about.  But I know for a fact that there was not, no, nothing mentioned about killing Bob Bishop at all in the kitchen.

(State's Lodging A-7, pp. 998:17-25 to 999:1-4.)

Petitioner testified that the first time they went to the Antler Club, McKinney had seen Bob Bishop tap Petitioner on the bottom several times near the jukebox, and that McKinney had given her "evil looks."  (State's Lodging A-7, p. 1006.)  Petitioner testified that when they returned to the Antler Club a second time, Bishop and McKinney were going to target shoot, and McKinney told her not to be monkeying around with anyone in

MEMORANDUM DECISION AND ORDER 27

the bar while he was gone. (*Id*., p. 1001.) Contrary to Tana Hampton and Lois Larsen Martinez's testimony, Petitioner testified that she didn't remember "no Tanya Tucker or whatever her name is, or no Lois" being at Casey Wheeless's home. (*Id*., p. 1001.)

Contrary to Ada's testimony, Petitioner testified that she said, "Randy, why did you do it?" rather, "You didn't have to kill him." Petitioner testified that McKinney then responded, "I just wish it was Jerry. Every time I shot Bishop, I was thinking of Jerry."[1] (State's Lodging A-7, pp. 1012-13.) Contrary to Dave Gunderson's testimony, she denied telling Gunderson that Bishop's murder was planned. (*Id*., p. 1029.)

Contrary to Casey Wheeless's testimony, Petitioner denied saying to him that he should change his testimony; however, she did remember becoming angry with him on the telephone, but does not remember why. (State's Lodging A-7, pp. 1030-1033.) Petitioner also testified that she didn't know how the ownership papers of the Mustang got into her purse; neither she nor Randy put them there. (*Id*., p. 1033.) She testified that she could identify the ownership papers only because she put the wallet in the glove compartment, and that's where it remained until the police stopped the car. (*Id*., p. 1036.) She denied Officer Hinds' testimony that the gun was found in her purse as were the ownership papers to the Mustang. (State's Lodging A-7, p. 1127.)

---

[1] Jerry Price was Petitioner's boyfriend that she was living with when she met McKinney; Petitioner alleged that Jerry beat her up and she had filed assault charges against him. (State's Lodging A-2, p. 223.)

MEMORANDUM DECISION AND ORDER 28

Petitioner stated that she never took out the gun at the motel and showed it to Ada, as Ada testified.  She stated that Randy never said he was going big time, no more penny ante," as Cathy testified.  (State's Lodging A-7, p. 1079.)  Petitioner could not identify the gun at trial.  (*Id.*, p. 1097.)  She testified she did show the gun to Casey, but had no purpose in doing so, but just said, "Look at this."  (*Id.*, p. 1098.)  Contrary to Ada and Casey's testimony that Petitioner had fired the gun out the window of the car, Petitioner testified that she had fired *a* gun only once before, "that knocked me on my tail" and that she did not fire the gun out the window.  (State's Lodging A-7, p. 1010 & 1098-1100.)  She said she could tell the gun that McKinney handed her was loaded, because it was heavy, and it was hot, and so she put it *on* her purse.  (*Id.*)

Petitioner denied Roy Helderman's testimony that she told him she was going back to Blackfoot when she left the Antler Club.  (State's Lodging A-7, p. 1114.)  She denied Ada's testimony that Petitioner told Ada to keep quiet and not tell anyone about Bishop's death.  (*Id.*, p. 1164.)  She said Ada had "testified to a lot of things that wasn't [sic] true." (*Id.*)

Parmenter called Robert Anderson as a witness, who, like Petitioner, testified he did not hear McKinney say anything about "going big time, no more penny ante," and that McKinney did not say anything derogatory about Anderson's race (African-American). (State's Lodging A-8, pp. 1213-1216.)  This testimony supported Petitioner's testimony and contradicted Cathy's testimony.

MEMORANDUM DECISION AND ORDER 29

For the State's rebuttal case, the prosecutor called Sharon Jackson, Wynnie Skelton, Lori Pottorf, and Wilbert Cammack to testify that Petitioner did not have a good reputation for veracity in the community.  (State's Lodging A-8, pp. 1235-1240-45.)  The State also called Richard Craven, a crime scene analyst.  He tested the gun, and stated that his tests showed it was never more than 1.5 degrees above body temperature (about 100 degrees), was merely warm to the touch, and cooled off almost immediately.  He testified that it was never hot, despite having fired it multiple times in succession.  (*Id.*, pp. 1262-1280.)

After deliberation, the jury found Petitioner guilty on all counts.  (State's Lodging A-2, pp. 130-131, 133, 135, & 137.)  At sentencing, the trial court declined to sentence Petitioner to death.  Petitioner received a fixed life sentence without the possibility of parole for the first degree murder conviction and the robbery conviction, an indeterminate thirty-year term for conspiracy to commit murder and conspiracy to commit robbery, all to run concurrently.  (State's Lodging A-2, pp. 236-38.)

C.     **Discussion of Ineffective Assistance of Counsel Claims**

1.     <u>Standard of Law</u>

A criminal defendant has a constitutional right to the assistance of counsel under the Sixth Amendment, made applicable to the states by the Fourteenth Amendment.  *Gideon v. Wainwright*, 372 U.S. 335 (1963).  In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established the proper test to be applied to claims alleging constitutionally inadequate representation.  To succeed on such a claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard

MEMORANDUM DECISION AND ORDER 30

of reasonableness and that (2) the petitioner was prejudiced thereby. *Id*. at 684. Prejudice under these circumstances means that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

In assessing whether trial counsel's representation fell below an objective standard of competence under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*. The pertinent inquiry "is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).

A petitioner must establish both incompetence and prejudice to prove an ineffective assistance of counsel case. 466 U.S. at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

2.    Claim One(1)

Petitioner alleges that her trial attorney was ineffective because he was inexperienced. The Idaho State Bar shows that Parmenter was admitted to the bar on September 21, 1979. Parmenter was appointed counsel for Petitioner on December 18,

MEMORANDUM DECISION AND ORDER 31

1981, approximately 30 months after his admission to the bar.  (State's Lodging A-1, p. 93.)

The Idaho Court of Appeals properly identified *Strickland* as the governing legal standard when reviewing this claim on appeal of Petitioner's post-conviction matter.  The Idaho Court of Appeals rejected the notion that Petitioner's counsel, David Parmenter, was ineffective simply because he was a new attorney:

> Although the level of a particular attorney's experience may shed light on an evaluation of his or her actual performance, it does not justify a presumption that counsel was ineffective.  Mere experience of counsel is not a sufficient basis for a claim of ineffective assistance, such claim must succeed or fail on counsel's performance, not his [or her] level of experience."

*Small II*, 971 P.2d at 1156-57 (internal citations and quotations omitted).

The Idaho Court of Appeals refused to address Petitioner's claims that counsel repeatedly failed to object to the introduction of evidence, failed to file a Rule 35 motion, and failed to request a *Holder* instruction because she had failed to raise these claims in the below in the state district court.  In addition to the foregoing claims being procedurally defaulted as found by the Idaho Court of Appeals, this Court also found that several other claims were procedurally defaulted for federal habeas corpus review purposes when Petitioner failed to present them to the Idaho Supreme Court for review after the Idaho Court of Appeals made its decision.  Particularly, the claim that Petitioner was on prescription drugs and that the drugs interfered with her ability to communicate with counsel was defaulted for failure to present it to the Idaho Supreme Court.  Here, Petitioner

MEMORANDUM DECISION AND ORDER 32

did not show cause and prejudice or actual innocence to excuse the default of these claims.

Therefore, rather than review each of Petitioner's procedurally defaulted claims as support

for her claim that her counsel was "inexperienced"–which would allow Petitioner to do an

end-run around the procedural default bar on those claims–the Court has reviewed the

entire record to determine whether it reflects "errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

*Strickland*, 466 U.S. at 687.  Under *Strickland*, there is a strong presumption that counsel

rendered adequate assistance.  *Id*. at 689.

     As the summary set forth above reflects, Parmenter adequately cross-examined the

most damaging witnesses to Petitioner's defense: Denise Garner, Casey Wheeless, and

Dave Gunderson.  Each of them had made prior statements, and Petitioner's counsel

highlighted the inconsistencies as well as challenged the motives each had for giving their

testimony.  Parmenter brought in Norman Turner to contradict Dave Gunderson's

testimony; he also brought in several witnesses to testify that Casey Wheeless did not have

a good reputation for truthfulness in the community.

     Parmenter attempted to call co-defendant Randy McKinney, but McKinney refused

to testify, even though he had testified in his own trial.  In response to the prosecution's

attempt to have the trial court compel McKinney to testify, the trial court concluded that

"until the man has been convicted and any such conviction finally affirmed in the appellant

[sic] process that he still could incriminate himself and he has a constitutional right not to

incriminate himself."  (State's Lodging A-6, p. 751.)

MEMORANDUM DECISION AND ORDER 33

Parmenter did not ask the Court to rule on each particular question to be asked of McKinney, but, instead, preserved for appeal the issue of whether the failure to testify violated Petitioner's right to compulsory process.  It is not evident from the record that Parmenter was ineffective in the way he handled the McKinney testimony.  Petitioner's own briefing on appeal shows that the law was far from clear on how such an instance should be handled by a trial court: "Unfortunately, no case law exists directly addressing the factual situation of the instant case."  (State's Lodging B-1, p. 21.)  Petitioner has not shown that McKinney should have been compelled to testify; or, if he had been compelled, she has not shown that he had non-self-incriminating testimony that would have aided her defense in light of the other evidence presented at her trial.

Indeed, had McKinney's statements and prior testimony been admitted at Petitioner's trial, they would have shown that McKinney made a large number of inconsistent statements.  At his own trial, he testified that he accidentally shot Bishop in the stomach, and Petitioner fired five shots at Bishop; McKinney denied that there was any advanced planning for the robbery and murder.  (See Order of September 25, 2009, p. 10, in *McKinney v. Fisher*, CV96-177-S-BLW, Docket No. 295.)  In his unsworn interview statements and later affidavit, he contradicts his trial testimony and says that Petitioner did not have anything to do with the murder.  (See Exhibits D & E to Petitioner's Amended Petition, Docket No. 30.)  At his sentencing, McKinney turned again, and argued that he should not receive the death penalty because he was dominated by Petitioner.  (State's Exhibit E-1, p. 79.)  In any event, all of the McKinney statements together do not

MEMORANDUM DECISION AND ORDER 34

adequately show Petitioner's actual innocence in light of the testimony of disinterested witnesses Casey Wheeless, Denise Garner, and Dave Gunderson.  Rather, all of McKinney's and Petitioner's statements are fraught with self-contradictions and contradictions between the two co-defendants, further diminishing the value of their testimony.[2]

Reviewing the overall transcript, the Court finds that Parmenter made various objections and motions to aid Petitioner's defense, and that he preserved a number of important issues for appeal.  He made an offer of proof on Petitioner's proposed expert witness, and made a motion for a directed verdict that the Court took under consideration. As set forth above, he adequately challenged the testimony of the State's witnesses and effectively used prior statements to impeach the witnesses.

On dismissing this ineffective assistance claim on post-conviction review, the district court concluded:

> That counsel at trial was inexperienced and never handled a capital case before [sic].  Again I think the law is that you've got to look at some of the standards before us.  Whether or not ineffective assistance was affected. Because he was inexperienced, there's something you could show on the record.  In other words, did he not do something he should have done; or did he do something he shouldn't have.  That would have made a difference.  I don't find the record, upon what has been presented in the petition, specifies

---

[2]  For purposes of Petitioner's procedurally defaulted claims, her contention that the McKinney affidavits and statements show that she is actually innocent is rejected because the affidavits and statements, in light of the evidence presented at Petitioner's trial and McKinney's testimony at his own trial, do not demonstrate that it is more likely than not that no reasonable juror would find her guilty beyond a reasonable doubt.  *See House v. Bell*, 547 U.S. 518, 538-40 (2006) (in assessing new evidence, habeas corpus courts consider all of the evidence and may have to make some credibility assessments).

MEMORANDUM DECISION AND ORDER 35

something that could have been done or should have been done that would
have changed the outcome.

(State's Lodging D-2, p. 22.)

      Similarly, after hearing the specific points Petitioner's counsel made at the hearing

on the State's motion for summary judgment on post-conviction review, the district court

noted:

> [E]ven to assume–and I think, Mr. Axline, you're correct, there's error
> in the record.  In the trial record.  You pointed out some of the errors in the
> admissibility of evidence.  But I can't see that, however, that would have
> come down, that it made any difference in the final outcome.  In other words,
> I can't and I don't find that there's a reasonable probability but for counsel's
> unprofessional error, the result overseen would have been different.  I don't
> think it would have on the matters that you have cited.

(State's Lodging D-2, p. 27.)

      Under *Strickland*, deficient performance can be found only if the errors made were

"so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the

Sixth Amendment." 466 U.S. at 687.   In other words, the Sixth Amendment does not

guarantee an error-free trial, but one that is free from serious error.  *See Turner v.*

*Calderon*, 281 F.3d 851, 872 (9th Cir. 2002).   Only serious error meets the second prong

of *Strickland*, which is a showing the deficient performance prejudiced the defense.  In

*Ortiz v. Stewart*, 149 F.3d 923 (9th Cir. 1998), the court noted, "It is well established that

an ineffective assistance claim cannot be based solely on counsel's inexperience."  *Id*. at

932.

MEMORANDUM DECISION AND ORDER 36

This Court agrees with the state district court that the record is free from serious error that would show Parmenter was ineffective as a result of his inexperience or that would show his performance was so deficient he was not functioning as counsel guaranteed by the Sixth Amendment.  Hence, the Idaho Supreme Court's opinion rejecting this Sixth Amendment claim is not an unreasonable application of *Strickland*.  Consequently, habeas corpus relief under § 2254(d) is unwarranted.

3.     Discussion of Claim One(2)(a)

Petitioner alleges that her trial attorney was ineffective because he failed to request appointment of a second attorney to assist him.  Respondent alleges that Attorney David Parmenter did, in fact, have an other attorney to assist him.  Attorney Christina Burdick assisted Petitioner's first attorney, Marlene Fleming.  (State's Lodgings A-1, pp. 66 & 76; A-3, pp. 49-59; A-8, pp. 1322-1420.)  However, while Burdick obviously performed some of the tasks at sentencing, she did not assist Parmenter with the trial, but was instead called as a witness.

On review of the post-conviction matter, the Idaho Court of Appeals explained that *Strickland* governed this claim and that the assertion that "counsel acted without co-counsel and was inexperienced are, standing alone, not enough to support a claim that counsel's assistance was ineffective."  *Small II*, 971 P.2d at 1156-67.

Addressing a similar claim, the United States Court of Appeals for the Ninth Circuit determined that there is no authority establishing that counsel is required to seek the appointment of a second attorney.  *King v. Schriro*, 537 F.3d 1062, 1072 (9th Cir. 2008).

MEMORANDUM DECISION AND ORDER 37

Rather, just as with the claim that an attorney is "inexperienced," the *Strickland* standard governs whether deficient performance and prejudice are shown. In Idaho "[t]here . . . is no requirement of a second attorney in a death penalty case." *State v. Porter*, 948 P.2d 127, 137 (Idaho 1997). Rather, the issue is decided on a case-by-case basis as a matter of the trial court's discretion. *Id.* In Petitioner's case, neither counsel nor Petitioner requested appointment of a second attorney.

The Court has thoroughly reviewed the state court record and finds no glaring area where a second counsel was necessary and would have made a significant difference in Petitioner's trial such that the representation by one counsel was rendered deficient. Rather, Petitioner has failed to point out, and the record fails to show, what deficiency arose as a result of one counsel and what prejudice to her case occurred. Rather, Petitioner's solo counsel performed adequately under the Sixth Amendment. As a result, the Court concludes that the Idaho Court of Appeals' decision on this claim is an unreasonable application of *Strickland*. Hence, habeas corpus relief is not warranted.

### D.     Claim Four

Petitioner's fourth claim is construed as one that her Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), were violated. Petitioner contends that her statements to Detective Richardson on April 8, 1981, should have been suppressed because she did not knowingly, intelligently, and voluntarily waive her *Miranda* rights prior to giving her statements. (State's Lodging B-1, pp. 26-32.) She particularly contends that she was under the influence of alcohol at the time she gave the statements.

MEMORANDUM DECISION AND ORDER 38

The Idaho Supreme Court did not specifically address the merits of this claim, but concluded that "any error regarding these matters was harmless beyond a reasonable doubt and does not warrant further consideration."  *State v. Small*, 690 P.2d 1336, 1337 (Idaho 1984.)   Respondent argues that because the Idaho Supreme Court did not address the merits, the claim must be reviewed de novo.  In *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002), the United States Court of Appeals for the Ninth Circuit determined that when the state court has not reached the merits of a properly raised claim, the federal district court reviews it de novo.  However, even though the claim is reviewed de novo, "under AEDPA, factual determinations by the state court are presumed correct and can be rebutted only by clear and convincing evidence."  *Id*.   Because the Idaho Supreme Court rejected the claim under a harmless error analysis, however, that portion of the analysis will be determined here under § 2254(d).  *See Cristini v. McKee*, 526 F.3d 888, 898-99 (6th Cir. 2008) (where no merits decision in the state court, the habeas corpus analysis is performed under de novo standard, but because state court rejected the claim as harmless error, § 2254(d) applied to the harmless error decision).

1.      Merits of *Miranda* Claim

The clearly-established law governing a suppression of a statement made to law enforcement officers is derived from *Miranda v. Arizona*, 384 U.S. 436 (1966).  *Miranda* requires that law enforcement officers must inform the suspect that he or she has the right to remain silent and the right to counsel before subjecting the suspect to custodial interrogation. "To be entitled to such warnings, two factors must be established: custody

MEMORANDUM DECISION AND ORDER 39

and interrogation." *Beaty v. Stewart*, 303 F.3d 975, 991 (9th Cir. 2002).  Respondent

contends that Petitioner's claim fails because she cannot show that she was in custody or

that she was interrogated by officers.

To determine whether an individual is in *custody*, the Court considers, in the context

of the totality of the circumstances, whether there was "a formal arrest or restraint on

freedom of movement of the degree associated with a formal arrest."  *California v. Beheler*,

463 U.S. 1121, 1125 (1983).

As to the *interrogation* element, the *Miranda* Court explained that only *compelled*

incrimination is prohibited by the Fifth Amendment:

> Confessions remain a proper element in law enforcement. Any
> statement given freely and voluntarily without any compelling influences is,
> of course, admissible in evidence. The fundamental import of the privilege
> while an individual is in custody is not whether he is allowed to talk to the
> police without the benefit of warnings and counsel, but whether he can be
> interrogated. . . .  Volunteered statements of any kind are not barred by the
> Fifth Amendment and their admissibility is not affected by our holding today.

384 U.S. at 478.

The term "interrogation" includes "either express questioning or its functional

equivalent."  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  In that case, the Court

further explained:

> That is to say, the term "interrogation" under *Miranda* refers not only to
> express questioning, but also to any words or actions on the part of the police
> (other than those normally attendant to arrest and custody) that the police
> should know are reasonably likely to elicit an incriminating response from the
> suspect.  The latter portion of this definition focuses primarily upon the
> perceptions of the suspect, rather than the intent of the police. This focus
> reflects the fact that the *Miranda* safeguards were designed to vest a suspect

MEMORANDUM DECISION AND ORDER 40

in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

*Id*. at 301-02.

The Court finds instructive the factors set forth in *United States v. Moya*, 74 F.3d 1117 (11th Cir. 1996), for determining whether Petitioner, as a reasonable innocent person, would have felt restrained from moving about freely to the degree associated with formal arrest: "he was not physically moved or restrained by officers on the way to the secondary interview; no handcuffs were employed and guns were not drawn; the defendant was not booked or told of formal accusations, nor told that he was under arrest; defendant did not ask to leave and the Inspector did not communicate to defendant that he was not free to do so; and the defendant made no admissions during the interview that would have led a reasonable person in his place to conclude that he would be arrested immediately."  *Id*. at 1119.  Similarly, in *U.S. v. Kim*, 292 F.3d 969 (9th Cir. 2002), the court identified the following factors used to determine whether a reasonable person would believe that she was not free to leave:  "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual."

MEMORANDUM DECISION AND ORDER 41

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Court further explained: "It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" (*Id*. at 482, quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

Here, police officers in patrol cars with flashing lights approached the bowling alley parking lot where Petitioner and McKinney were in Bishop's car.  Officer Fawcett advised them to exit the vehicle, but Petitioner and McKinney instead proceeded to drive to Petitioner's sister's trailer home.  (State's Lodging A-5, pp. 331-36.) The officers followed them, but made no attempt to detain or forcibly stop Petitioner when she jumped out of the car and went into the trailer house.  When McKinney exited the car, "he was advised to approach the patrol units with a great deal of caution."  He did, and briefly spoke to officers.  (*Id*., p. 338.)  When a radio call came in, McKinney left and entered the trailer house.  (*Id*.)

Officers did not attempt to stop McKinney or forcibly enter the trailer house.  Ron Mangum, an occupant of the trailer house, admitted officers to the home voluntarily.  (*Id*., p. 339.)

Officer Frew initially took McKinney into protective custody.  He was searched, handcuffed, and placed in the back of a police car.  (*Id*., p. 340.)  Contrarily, Petitioner was not taken into custody, protective or otherwise.  Officer Fawcett left the trailer home,

MEMORANDUM DECISION AND ORDER 42

Officer Frew re-entered it to look for the driver of the car (Petitioner), and Officer Fawcett returned.  (*Id*., p. 341-46.)  While Petitioner and Ada remained sitting on the sofa, Officer Fawcett asked Ada what she had seen.  She stated that she had seen Bishop's dead body and that Randy had killed him.  Then Officer Fawcett asked Petitioner what she had seen. She said, "I seen Bob Bishop.  He's dead.  And Randy shot him."  Then she said, "Maybe he's not dead yet.  I know where he's at.  I'll take somebody there and show them where he's at."  (*Id*. at 346.)

Petitioner was not restrained and was not confronted with any evidence of her guilt, but went outside freely and offered to take Detective Anderson to the scene of the crime. Petitioner entered Detective Anderson's car voluntarily, and there is no indication that at any time during the ride her presence in the car lost its voluntary nature.   Therefore, the Court concludes that Petitioner was not "in custody" for *Miranda* purposes.

Petitioner, likewise, volunteered her statements during the ride to the crime scene. Thus, even if Petitioner was not informed of her rights, there was no "interrogation" or "coercion" up to the point when Detective Anderson determined that Petitioner might have been giving statements that fit within the scope of *Miranda*.  At that point, he alleges that he informed her of her rights, and he asked her limited questions.  Anderson alleges that Petitioner indicated that she understood her rights.  Petitioner testified at trial that she knew the recording was taking place, although she did not see the recorder.  However, Petitioner alleges in her Response that she was not given any *Miranda* warnings until "after she made incriminating statements to Detective Richardson."  (Petitioner's Response, pp. 18-19,

MEMORANDUM DECISION AND ORDER 43

Docket No. 66.)  At this point, when Detective Richardson thought that Petitioner was

going to give incriminating statements and he was asking limited questions, it is arguable

that Detective Richardson's questions fell under the classification of interrogation. *See*

*Rhode Island v. Innis*, 446 U.S. at 301-02.

However, the custody element still was not met.  After viewing the body, Petitioner

and her sister voluntarily went to the Sheriff's Office with officers.  It was not until later

that evening that Petitioner was placed under arrest for an unrelated outstanding forgery

charge.  (State's Lodging A-5, p. 374.)[3]

Petitioner also alternatively argues that she was under the influence of alcohol when

Detective Anderson read her *Miranda* rights to her in the police vehicle, and thus was not

able to waive her *Miranda* rights knowingly and intelligently.  However, merely being

under the influence of alcohol is not enough.  Here, she was able to drive from the bowling

alley to the trailer park, to walk to and from the trailer house, to direct Officer Anderson

to the victim's body, and to tell a coherent story.  In addition, the owner of the bar where

Petitioner had been drinking testified at trial that she had been able to play pool and had not

fallen down while in the bar.  Petitioner herself testified at trial, "I had my limit.  But I

wasn't what you would call drunk, okay?"  (State's Lodging A-7, p. 1002.)  In summary,

---

[3]  Officers again read Petitioner her rights at the Sheriff's Office, and she refused to sign
a waiver.  Petitioner was not arrested in connection with the Bishop crimes until August 5, 1981,
nearly four months after the date of the murder and of the statements made to Detective
Anderson.  (State's Lodging B-1, p. 4.)

MEMORANDUM DECISION AND ORDER 44

nothing in the record indicates that Petitioner was so intoxicated that her waiver of her right

to remain silent and obtain counsel was not voluntary, knowing, or intelligent.

Furthermore, there is no clearly established law from the United States Supreme

Court showing that taking the statement of an accused who is under the influence of alcohol

is a violation of *Miranda*.  Based on all of the foregoing under a de novo review standard,

the Court concludes that Petitioner's Fifth Amendment right to avoid self-incrimination

was not violated on April 8, 1981, during the conversations between Petitioner and officers

investigating the Bishop murder.[4]

---

[4]  The Ninth Circuit very recently addressed the issue of whether intoxication can render a waiver to be not voluntary, knowing, and intelligent in the context of habeas corpus:

> While it is true that a waiver of one's *Miranda* rights must be done intelligently, knowingly, and voluntarily, 384 U.S. at 444, 86 S.Ct. 1602, the Supreme Court has never said that impairments from drugs, alcohol, or other similar substances can negatively impact that waiver. *See Carey v. Musladin*, 549 U.S. 70, 74, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (" '[C]learly established Federal law' in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." (internal quotation marks and citation omitted)). We have held that an intoxicated individual can give a knowing and voluntary waiver, so long as that waiver is given by his own free will. *United States v. Banks*, 282 F.3d 699, 706 (2002), *rev'd on other grounds*, 540 U.S. 31, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003); *see also United States v. Kelley*, 953 F.2d 562, 565 (9th Cir. 1992) [*disapproved on other grounds, United States v. Kim*, 105 F.3d 1579, 1581 (9th Cir. 1997)]. However, at the time of Matylinsky's *Jackson v. Denno* hearing, there was no established law regarding the effect of alcohol and drugs on the voluntariness of a *Miranda* waiver. And, when the state district court determined that Atcheson's actions were reasonable during its habeas review, there was no United States Supreme Court precedent on the topic. Therefore, we cannot say that counsel's failure to present cases on this point was unreasonable. And, furthermore, under AEDPA we cannot hold that the Nevada cour''s decision here was contrary to any established United States Supreme Court precedent.

*Matylinsky v. Budge*, 577 F.3d 1083, –, 2009 Wl 2501932, at *8 (9th Cir. 2009).  Here, the Court is using a de novo standard, but the *Matylinsky* case is nevertheless instructive that intoxication does not per se mean that a statement is not knowing, intelligent, or voluntary.

MEMORANDUM DECISION AND ORDER 45

2.    Harmless Error

Next, the Court reviews the Idaho Supreme Court's decision that, even if the conversations between Petitioner and officers on April 8, 1981, violated her *Miranda* rights, admission of the testimony was harmless error beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18 (1967).  *See Small I*, 690 P.2d at 505.  The Ninth Circuit has recently clarified that a federal habeas court reviewing a state court ruling of harmless error must review the state court decision in two steps: (1) the federal district court should first determine whether the state court's harmless error application was objectively unreasonable; (2) if the decision is objectively unreasonable, then the federal court "should engage in an independent harmless error analysis applying the standard articulated in *Brecht [v. Abrahamson*, 507 U.S. 619 (1993)]."  *Inthavong v. LaMarque*, 420 F.3d 1055 (9th Cir. 2005).  *Chapman* is the standard to be used on direct appeal, while *Brecht* is the standard that "appl[ies] uniformly in all federal habeas corpus cases under § 2254."  *Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000).  The United States Supreme Court confirmed this approach in *Fry v. Pliler*, 551 U.S. 112 (2007).

In *Brecht v. Abrahamson*, the Court held that federal courts may grant a writ of habeas corpus based on trial errors only when the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623 (quoting *Kotteakos v.*

MEMORANDUM DECISION AND ORDER 46

*United States*, 328 U.S. 750, 776 (1946)).  The Ninth Circuit has applied harmless error

analysis to *Miranda* claims.  *See U.S. v. Lopez*, 500 F.3d 840 (9th Cir. 2007).

As set forth above, this Court has determined that constitutional error did not occur.

The next step is then to determine whether the Idaho Supreme Court's decision was

objectively unreasonable when it decided that, even if a *Miranda* violation occurred, the

error was harmless under *Chapman*.

Here, there is ample evidence in the trial record to support the conclusion that the

jurors would have reached the same result if Officer Anderson's entire testimony regarding

Dovey Small's conversations of April 8, 1981, would have been excluded.  That testimony

concerned Petitioner's directing Detective Anderson to the body and her discussion of

McKinney's admission that he had killed Bishop.  Petitioner's own testimony repeated

these same points.  The vast majority of the evidence that implicated Petitioner in the

planning of the robbery and murder came from Denise Garner (Wheeless), Casey

Wheeless, and Dave Gunderson.  Petitioner's statement to Detective Anderson did not bear

on the subject to which these three critical witnesses testified–that McKinney and Petitioner

planned the murder and robbery together beforehand.

Under these circumstances, omission of Detective Anderson's testimony about the

unsworn statements of Petitioner would not have changed the outcome of the trial.

Accordingly, the Idaho Supreme Court decision that admission of the evidence was

harmless error beyond a reasonable doubt was not an unreasonable application of

*Chapman*.  As a result, it is unnecessary to undertake a *Brecht* analysis, and the Court

concludes that habeas corpus relief on the *Miranda* claim is not warranted.

 The Court also notes that while the recorded statement was not entered into

evidence, it was used for impeachment purposes during the cross-examination of Petitioner.

In *U.S. v. Havens*, 446 U.S. 620 (1980), the United States Supreme Court held that a

defendant's statements made on proper cross-examination (within the scope of direct

examination) may be properly used for impeachment purposes by the government, even if

the evidence was illegally obtained and is inadmissible as substantive evidence of guilt.

 Therefore, here, the unsworn statement, even if obtained in violation of *Miranda*,

was  properly used for impeachment purposes. Going one step further, this Court also

concludes that omitting the cross-examination testimony based on the recorded statement

would not have affected the outcome of the trial.  The only significant point the prosecutor

made by using the Detective Anderson statement was that Petitioner told him she gave

Bishop's jacket to Cathy because Petitioner thought it might have blood stains on it and she

didn't want law officers to find it in the car.  Cross-examination on the Detective Anderson

statement appears on pages 1167 to 1172 of the trial transcript, a total of six pages.  (State's

Lodging A-7, pp. 1167-1172.)  Cross-examination on an April 4, 1981 transcript of a

hearing before Judge Phillips totaled seven pages.  There, the prosecutor brought out that

Petitioner had earlier testified that she put the gun *in* her purse.  (*Id.*, pp. 1173-1179.)

Cross-examination on an April 27, 1981 hearing lasted for seven pages.  The prosecutor

showed that Petitioner had earlier testified that she did not have the gun and she knew that

MEMORANDUM DECISION AND ORDER 48

there were other adult women present in the living room at the Wheeless residence during the alleged kitchen conversation.  (*Id*., pp. 1179-1185.)  Cross-examination on Petitioner's deposition totaled eighteen pages, and covered whether the group had smoked marijuana, whose idea it had been to choose a particular route, and whether McKinney had told her the number of times he said he shot Bishop.  (*Id*., pp. 1185-1202.)   In contrast, cross-examination on Petitioner's testimony in her case in chief went on for 132 pages, and revealed many discrepancies in her trial testimony.  (*Id*., pp. 1034-1166.)   As noted directly above, the prosecutor had three additional transcripts containing sworn testimony from Petitioner that he used for impeachment purposes.  Use of the unsworn statement was minimal in terms of substance and in terms of the amount of time spent on the statement in cross-examination.

Therefore, admission of the sworn statement substance for impeachment purposes was not error.  Even if it were, the admission of the evidence was harmless beyond a reasonable doubt in light of the entire scope of cross-examination and the other evidence presented at trial, and, thus, Petitioner has not shown that the Idaho Supreme Court's *Chapman* decision was unreasonable under § 2254(d).[5]

---

[5] Petitioner further contends that her *Miranda* rights were violated when officers obtained information from a jailhouse informant, and then questioned Petitioner with that information without a *Miranda* warning.  That auxiliary issue was not presented to the Idaho appellate courts, and Petitioner has failed to show cause and prejudice or actual innocence that would permit the Court to address it here without proper exhaustion.

MEMORANDUM DECISION AND ORDER 49

**CONCLUSION**

As set forth above, the Court finds and concludes that Petitioner has not shown cause or prejudice or actual innocence to excuse the default of the procedurally defaulted claims.  As to the remaining claims, Petitioner is not entitled to relief on the merits of her claims under 28 U.S.C. §  2254(d).  As a result, Petitioner's entire Petition shall be denied and dismissed with prejudice.

**REVIEW OF THE CLAIMS AND THE COURT'S DECISION
FOR PURPOSES OF CERTIFICATE OF APPEALABILITY**

In the event Petitioner files a notice of appeal from the Order and Judgment in this case, and in the interest of conserving time and resources, the Court now evaluates the claims within the Petition for suitability for issuance of a certificate of appealability (COA), which is required before a habeas corpus appeal can proceed.  28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  A COA will issue only when a petitioner has made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). The Supreme Court has explained that, under this standard, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.*"  Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal citation and punctuation omitted).

When a court has dismissed a petition or claim on *procedural grounds*, in addition to showing that the petition "states a valid claim of the denial of a constitutional right," as

MEMORANDUM DECISION AND ORDER 50

explained above, the petitioner must also show that reasonable jurists would find debatable whether the court was correct in its procedural ruling. *Slack,* 529 U.S. at 484. When a court has dismissed the petition or claim on the merits, the petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484. The COA standard "requires an overview of the claims in the habeas petition and a general assessment of their merits," but a court need not determine that the petitioner would prevail on appeal. *Miller-El*, 537 U.S. at 336.

Here, the Court has denied some of Petitioner's claims on procedural grounds, and some on the merits. The Court finds that additional briefing on the COA is not necessary. Having reviewed the record again, the Court concludes that reasonable jurists would not find debatable the Court's decision on the procedural issues and the merits of the claims raised in the Petition and that the issues presented are not adequate to deserve encouragement to proceed further. As a result, the Court declines to grant a COA on any issue or claim in this action. Petitioner may file a timely notice of appeal and request a COA from the Ninth Circuit Court of Appeals, if she desires, pursuant to Federal Rule of Appellate Procedure 22(b).

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED:

A.    Petitioner's Motion to Reserve the Right to Address Claims One and Four (Docket No. 56) is GRANTED;

B.      Respondent's Motions for Extension of Time to File a Motion for Summary

Judgment (Docket No. 55, 58, & 59) are GRANTED;

C.      Petitioner's Motions for Extension of Time to File Response (Docket Nos. 60

& 65) are GRANTED;

D.      Petitioner's Motion for Appointment of Counsel (Docket No. 51) is

DENIED; and

E.      Respondent's Motion for Summary Judgment (Docket No. 62) is

GRANTED.

IT IS FURTHER HEREBY ORDERED that Petitioner's Petition is DISMISSED

with prejudice.

IT IS FURTHER HEREBY ORDERED that the Court will not grant a Certificate of

Appealability in this case.  If Petitioner chooses to file a notice of appeal, the Clerk of

Court is ordered to forward a copy of this Order, the record in this case, and Petitioner's

notice of appeal, to the United States Court of Appeals for the Ninth Circuit.

**SO ORDERED** this 30th day of September, 2009.

Honorable Edward J. Lodge
U. S. District Judge

MEMORANDUM DECISION AND ORDER 52